## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHELDON SOULE, an individual, | No. 59172-3-II |
| Appellant, | |
| v. | |
| | UNPUBLISHED OPINION |
| STATE OF WASHINGTON BY AND THROUGH BOB FERGUSON AND HIS OFFICE OF ATTORNEY GENERAL, a public agency, | |
| Respondent. | |

PRICE, J. — Sheldon Soule appeals the superior court's dismissal of his Public Records Act (PRA)[1] claim against the Attorney General's Office (AGO). Soule alleges that the superior court abused its discretion when it denied his motion to extend discovery and quashed his CR 43(f) notice to AGO representatives to attend the merits hearing. Soule also contends that the dismissal was error because the AGO failed to promptly and adequately search for records responsive to his PRA request. We affirm the superior court.

### FACTS

#### I. SOULE'S INITIAL PRA REQUEST

On January 3, 2020, Soule sent a PRA request to the AGO asking for records related to the 2010 national mortgage settlements between Wells Fargo Bank and the State of Washington. His request specified the following records:

---

[1] Ch. 42.56 RCW.

A.  All communications between Wells Fargo Representative Mark Elliot or any other Wells Fargo employee or representative and the below listed employees, or any other employee at the Washington State Attorney General's office in relation to the 2010 Assurance of Discontinuance (AOD) and the National Mortgage Settlement (NMS) Wells Fargo made with Washington State.

Clerk's Papers (CP) at 95.

He also requested various personnel records, specifically,

B.  All records in the personnel files of the following current or former employees of the Washington State Attorney General's office:

1. David Huey

2. Rich Zwicker

3. Shannon Smith

4. Any and all employees, paralegals, legal assistants, analysts, accountants or lawyers who had any involvement with the 2010 Assurance of Discontinuance (AOD) and the National Mortgage Settlement(s) (NMS) Wells Fargo made with Washington State. This should include all communications between AGO employees about the AOD or National Mortgage Settlement and any communications to or from Wells Fargo representatives about the AOD or National Mortgage Settlement.

CP at 95.   Among other personnel records, Soule requested "[p]erformance appraisals and reviews" and "[a]ny formal or informal employee evaluations and reports relating to the above listed employee's character, work habits, compensation, and benefits."  CP at 95-96.

After receiving Soule's request, the AGO reached out to all employees in the Consumer Protection Division who might have responsive records.  Employees searched the AGO's physical files, electronic files, e-mail database, human resources records, and consumer complaint database for records responsive to Soule's request.  After reviewing each record to ensure that it was relevant to what Soule was looking for, the employees redacted and organized over 30,000 pages

of records, which they sent to Soule in 17 batches over the course of almost two years, May 2020 through May 2022.[2] The AGO closed the request in May 2022.

## II. SOULE'S COMPLAINT FOR ALLEGED VIOLATIONS OF THE PRA

In May 2023, Soule filed a civil suit in Thurston County Superior Court against the AGO for violations of the PRA. Soule alleged that the AGO, among other things, failed to promptly and adequately search for records responsive to his request.

In Thurston County, PRA cases are subject to a local rule that requires the parties to participate in a status hearing early in the case, which results in a scheduling order. THURSTON COUNTY SUPER. CT. LOCAL CIV. R. (TCLCR) 16. Pursuant to this local rule, Soule and the AGO met with the superior court in June 2023, where the court heard from the parties as to the nature of the case. Following the hearing, the superior court issued a scheduling order on June 22. The scheduling order required "[a]ll discovery on the merits" to be completed by September 29, 2023, and set a briefing schedule to follow the discovery. CP at 70-71. The hearing on the merits was scheduled for 1:30 p.m. on November 17, 2023.

### A. THE AGO'S MERITS BRIEF AND SUPPORTING EVIDENCE

Discovery closed at the end of September 2023 without Soule having conducted any formal discovery. A few weeks later, in October 2023, the AGO filed its opening brief along with several supporting declarations from various AGO employees who were involved with responding to Soule's PRA request.

---

[2] Soule contends that only a modest amount of these documents were e-mails and other correspondence.

1. Declarations of Senior Public Records Officer—Kristin Young

Kristin Young, a senior public records officer for the Public Records and Constituent Services Division of the AGO, provided two declarations regarding her involvement as a point of contact between Soule and the agency while it responded to Soule's request.

Young said that she acknowledged receipt of Soule's request on January 10, 2020, five business days after receiving it. She then began communicating with Soule about the scope of his request. Her declaration attached e-mails documenting many of her communications with Soule. For example, Young asked Soule in January and February 2020, and a third time in September 2021, if he could narrow search requests for " 'all files in the personnel records' " of various employees and for " 'all communications.' " CP at 88 (quoting CP at 95). Young told Soule that if he did not narrow his requests, his search would result in thousands of pages in personnel records and consumer complaints and that it would take longer for the AGO to fulfill his request. Young also noted that the personnel records specifically would need to be "heavily redacted." CP at 102.

Soule, in responsive e-mails, pushed back on the need to redact the personnel records, stating that "performance evaluations are not exempt from requests under the PRA when it relates to the performance of a public official," so that his "request for personnel records related to performance evaluations specifically stands as it was originally submitted." CP at 101. But he also told Young that she could ignore his request for other personnel records. Soule further agreed to narrow his request for " '[a]ll communications' " and, instead, gave Young a list of 13 specific categories of consumer complaints that he wanted. CP at 125 (quoting CP at 95).

Young's declaration also explained that while Young was still clarifying Soule's request she began the search for responsive records. A week after acknowledging his request, Young sent

Soule's request to the Consumer Protection Division of the AGO and inquired whether they had responsive records and also asked for assistance in formulating search terms to conduct an e-mail search. She stated that the Consumer Protection Division gave her a list of names of individuals who were involved with the 2010 Assurance of Discontinuance and the National Mortgage Settlement(s) Wells Fargo made with Washington State. They also provided her with the search terms " 'wells fargo' AND ('assurance of discontinuance' OR 'national mortgage settlement')." CP at 89.

Young explained that upon receiving the list of names from the Consumer Protection Division in February 2020, she coordinated with the AGO's human resources office to obtain the relevant personnel records of 13 different AGO employees. Young directly e-mailed the 5 employees still working for the AGO to see if they had records responsive to Soule's request.

Young also described the search that she conducted of the AGO's centralized e-mail database, Outlook 365. Young searched all of the AGO Outlook accounts, e-mails, and e-mail attachments using the search terms provided to her by the Consumer Protection Division. Young explained that she used these search terms because they were "very broad." CP at 366. For example, Young said, "The records resulting from this search necessarily included any records involving Mark Elliot because [he] was an employee of Wells Fargo and the search picked up all emails involving Wells Fargo and assurance of discontinuance or national mortgage settlement. The search was in fact broader than simply searching for Mark Elliot." CP at 366. If the relevant search terms were located anywhere in "the body of the email, subject line, to and from and cc/bcc, threads within the email, and attachments," Young claimed they would come up in her search. CP at 366.

Young explained that she then reviewed the 5,953 e-mails that resulted from her search, including "many communications with Mark W. Elliot." CP at 366. Young also reviewed the consumer complaints that were later sent to Soule, stating that they "contain[ed] many communications between and among members of the AGO and Wells Fargo." CP at 366.

Young stated that she provided Soule with his first batch of records in May 2020. After this first batch, Young notified Soule that a new batch of records was ready about every eight weeks. Over the course of nearly two years, Young sent Soule 17 batches of records, totaling to over 30,000 pages.

2. Declaration of Public Records Coordinator—Andrew Gutzmer

The AGO also submitted a declaration from Andrew Gutzmer, who at the time of Soule's request was a public records coordinator in the AGO Consumer Protection Division. He stated that he e-mailed "everyone" in the Consumer Protection Division and instructed them to "review [Soule's] public records request, conduct a search for records and determine if they had responsive records." CP at 239. If the individuals had responsive records, they were directed to indicate this on a tracking list Gutzmer had created.

Gutzmer also stated that he compiled responsive records from two different databases: the AGO's "Constituent Correspondence Tracking Notebook" and "Catalyst," a database of consumer complaints. CP at 239. Gutzmer said that he searched both databases for records and complaints regarding Wells Fargo. CP at 239. He conducted his search by using the 13 categories of consumer complaints provided by Soule.

3. Declarations of Consumer Protection Division Employees—Amy Teng and Lesli Ashley

Amy Teng was the only employee in the Consumer Protection Division who responded that she had records responsive to Soule's request. Teng provided a declaration in which she said that she "worked with Division Chief Shannon Smith, Litigation Support Manager Margaret Farmer, and Paralegal Lesli Ashley regarding where records might be located." CP at 257. The four of them searched for both physical and electronic records that would be responsive to Soule's request. Teng and Smith then reviewed the records, determining which ones were responsive and redacting privileged or exempt information. Teng also stated that she assisted Young by providing appropriate search terms for an e-mail search.

Lesli Ashley, the paralegal in the Consumer Protection Division who worked with Teng, also supplied a declaration. Ashley explained that she searched for responsive physical records and electronic records. For electronic records, Ashley searched "the AGO's electronic folder drive" known as the "F: drive" for "all the electronic files that the AGO had regarding the Wells Fargo national mortgage settlement." CP at 259-60. The searched folders included those labeled "Wells Fargo Assurance of Discontinuance" and "Wells Fargo National Mortgage." CP at 259. Ashley also searched using broad search terms such as "dave huey" and "wells fargo," taking care to search for "a particular communication between [Assistant Attorney General (AAG)] Dave Huey and Wells Fargo that Mr. Soule believed existed." CP at 260. Ashley stated, "I searched everywhere we thought records would still be in existence." CP at 260. Ashley then reviewed all the records resulting from her search to confirm if they were responsive and to mark them for potential redactions.

4. Declaration of Deputy Chief Information Officer—Martin Singleton

Martin Singleton, the deputy chief information officer at the AGO, submitted a declaration in which he discussed the AGO's different databases and electronic data retention policies. He explained that although in the past the AGO used the Discovery Accelerator system to hold archived e-mails, the AGO migrated all archived and new e-mails to Office 365 in 2019. During this shift from Discovery Accelerator to Office 365, "AGO emails themselves were not impacted or altered." CP at 371.

B. SOULE'S LATE DEPOSITION NOTICE AND MOTION TO EXTEND DISCOVERY

About two weeks after discovery closed and around the same time the AGO filed its merits brief and supporting declarations, Soule served the AGO with a notice of deposition. Because the notice was untimely, the AGO filed a motion to quash. Soule responded by filing a "cross motion" to extend discovery.

The superior court heard oral argument on both motions. The AGO argued that Soule's deposition notice and motion to extend discovery were untimely and violated the superior court's scheduling order. The AGO noted that "[d]uring those four months between when the lawsuit was filed and discovery cut-off ended, no discovery was conducted at all" and that "[t]here [was] no reason" that Soule could not have conducted this deposition before the discovery deadline. Verbatim Rep. of Proc. (VRP) (Oct. 27, 2023) at 6-7. The AGO also reasoned that because it carries the burden in PRA cases to prove that there was no violation of the PRA, that Soule "[did] not need a deposition." VRP (Oct. 27, 2023) at 9. The AGO further argued that it would be prejudiced by this delay because "the State is on the hook for penalties that run per day from the

date of withholding. So if there is an inadequate search, then the State is on the hook for these penalties." VRP (Oct. 27, 2023) at 18.

Soule's attorney apologized for missing the superior court's discovery cutoff in the scheduling order and explained that the case involved "a myriad of issues, complicated set of historical facts[] and volumes of records that needed to be digested in a short period of time" and that "four months is a very short time frame for discovery in a sole practitioner's practice where there are multiple cases with competing interests." VRP (Oct. 27, 2023) at 11-12. Soule's attorney said she had multiple professional and personal obligations that were unanticipated which made it difficult to conduct all the discovery that she needed.

Soule also argued that denial of his motion would be a manifest injustice because "[i]t is inherently unjust to deny a plaintiff the opportunity to cross-examine witnesses testifying on behalf of the other party." VRP (Oct. 27, 2023) at 13. Soule further argued that the AGO would not be prejudiced because although Soule sought to depose a representative from the AGO, he did not seek to change the briefing schedule.

Following the arguments, the superior court granted the AGO's motion to quash and denied Soule's cross motion to extend discovery. The superior court explained that granting Soule's extension would prejudice the AGO because of the risk of increased penalty and because, at that point, the State had already prepared and filed its opening brief "with the knowledge of not having gone through the discovery that could have been done." VRP (Oct. 27, 2023) at 20.

The superior court also placed importance on Soule's failure to articulate why additional discovery was needed and the fact that Soule did not ask for a continuance until after the discovery deadline had passed; the superior court explained,

> What's probably the driving consideration is in the response to the motion to quash, there is no mention of what specific issues need to be explored on discovery. The entirety of the response on motion to quash is I didn't appreciate that I had this deadline, I didn't think it was going to apply in this setting, in regular civil context it does—I have some latitude, and I've been really busy.

> And, again, I'm not unsympathetic to personal and work demands, but as those are interfering with meeting deadlines, you ask for relief informally with opposing counsel and, if necessary, with a motion. But it is not an after-the-fact evidence of manifest injustice, and I don't see any detailed description of now that I'm at this point, here is the specific information that is critical to my case.

> So thinking about the nature of the case with the State having the burden and the petitioner having to have sufficient grounds when they file the case that they can make an argument, I'm not seeing that there's manifest injustice to extend the deadline to allow the discovery after the discovery deadline.

VRP (Oct. 27, 2023) at 21-22.

C. SOULE'S NOTICE TO ATTEND

Immediately following the denial of the motion to extend discovery, Soule served the AGO with a notice to attend merits hearing, which listed the six AGO employees who submitted declarations. Having lost the ability to take their depositions, Soule apparently intended to cross-examine the employees in person at the November 17 merits hearing. The AGO filed another motion to quash.

At the hearing on the motion, the AGO argued that Soule's notice to attend was "a blatant attempt" to circumvent the superior court's earlier denial of additional discovery. 1 VRP (Nov. 17, 2023) at 5. The AGO also argued that in addition to this notice being a violation of the superior court's scheduling order, "live testimony . . . [was] simply not necessary at all in this case." 1 VRP (Nov. 17, 2023) at 5. The AGO noted,

> [F]rom the start, from the scheduling conference, [we have] only discussed this matter in terms of a hearing on the merits being held on affidavit which the Public Records Act specifically permits. . . .  Most of these cases . . . in fact, the majority of them, are heard on affidavit.
>
> . . . .
>
> Plaintiff never mentioned live testimony during the scheduling conference, did not ask for a witness list, did not ask for additional time.  We did not set the . . . hearing date as a trial hearing where witnesses would be present.  Witnesses . . . were only mentioned for the first time three weeks ago, and this case was filed five months ago.

1 VRP (Nov. 17, 2023) at 5-6.

Soule responded that "[t]his case was set for trial" and that "[t]he representation that the scheduling order is for the purposes of setting a briefing on the merits without live testimony is completely fictitious."  1 VRP (Nov. 17, 2023) at 8.  According to Soule, because CR 42 "basically says, 'At trials, the testimony of witnesses shall be taken orally in open court' " and because Thurston County Superior Court Local Civil Rule 3 specifically refers to a "trial setting date . . . for Public Records Act cases," he was entitled to cross-examine the AGO's declarants.  1 VRP (Nov. 17, 2023) at 8, 13.

Soule also contended live testimony was necessary to challenge the credibility of the AGO's declarants:

> [W]hat the Attorney General's Office is proposing is that it be allowed to deceive this court and withhold the opportunity from this court to weigh the credibility of the nine different declarants or seven different declarants whose testimony is put before the court when that testimony in and of itself is disputed and is in question and on its face raises credibility questions about the testimony that is offered.

1 VRP (Nov. 17, 2023) at 8-9. Soule further argued that he could not counter the AGO's evidence with his own declaration and that he specifically needed to cross-examine the AGO's declarants to point out inconsistencies in their testimony.

The superior court asked Soule, assuming that it accepted his argument, how he thought he would be able to examine six witnesses during the two-hour time block for which the hearing was scheduled. Soule responded that he would not need more than 45 minutes to question all six witnesses.

The superior court granted the AGO's motion to quash. The superior court explained that typically PRA merits hearings were heard by declaration and that the parties should have raised the potential for live testimony earlier:

> The major thing is that there is a scheduling order and there was a hearing in June where the court takes input from the parties as to the nature of the case. Most of the time public records cases, because they are to be expedited, and because the law allows it, the issues are addressed on affidavit. That is not required, but parties need to tell the court when we're setting the schedule that this is a different kind of case.
>
> . . . .
>
> Nobody raised that issue in June in this case, and the scheduling order that the court prepared is a scheduling order contemplating a hearing that is going to last one to two hours, and it has a briefing schedule. It says nothing about testimony, and we have a trial setting process where we would have had an estimated length of trial and would have identified the number of witnesses.

1 VRP (Nov. 17, 2023) at 15-16. The superior court also reasoned that if Soule had actually conducted discovery before the cutoff, the discovery may have resulted in Soule realizing far earlier that he may have wanted a change of the format of the hearing and a timely motion could

have been brought. The court concluded by emphasizing that the merits hearing that was scheduled was not an "evidence[-]taking hearing with witnesses." 1 VRP (Nov. 17, 2023) at 16.

Soule objected to the superior court's ruling, arguing that "[t]here's been procedurally and historically no past practice with this court or any court in the Thurston County rule pretrial scheduling process to identify whether or not the case is going to be heard on live testimony or not when setting the trial." 1 VRP (Nov. 17, 2023) at 17. The superior court "noted" Soule's objection. 1 VRP (Nov. 17, 2023) at 17.

### D. PRA HEARING AND SUPERIOR COURT FINDINGS

At the subsequent merits hearing, Soule contended, among other things, that the AGO's search was inadequate and that they "didn't search in the right location using the right technologies," because the AGO did not produce a significant number of e-mails using the search terms that they did. 2 VRP (Nov. 17, 2023) at 40. Soule noted that the AGO's failure was clear because from their search he received only nine e-mail chains as part of his request.

The AGO explained that the modest amount of e-mails was due to the AGO's retention policy. It said that the lead attorney working on the matters with Wells Fargo retired and that even though that attorney's mailbox and old files were searched, responsive documents likely had been deleted per the AGO's retention policy. The AGO explained that internal policy only requires records to be retained for six years.[3] Thus, by 2016, four years before Soule made his PRA request, "all the litigation files [could have been] wiped." 2 VRP (Nov. 17, 2023) at 14.

---

[3] Following the hearing, the AGO provided the superior court with information regarding this retention policy.

After the merits hearing, the superior court found that the AGO had met its burden of showing that it had conducted an adequate and reasonable search and did not violate the PRA. The superior court also found that although the AGO took two and a half years to complete production for Soule's request, "given the description of what was provided and the need to review for personal identifying information, etc., given the content of the records referring to specific private individuals and their mortgage documents," the AGO's response was timely under the PRA. VRP (Dec. 22, 2023) at 16-17. Based on these findings, the superior court dismissed Soule's case with prejudice.

Soule appeals.

ANALYSIS

Soule argues the superior court erred for several reasons—some reasons are focused on the superior court's prehearing rulings and some are focused on the underlying PRA merits. Specifically, Soule contends that the superior court erred by (1) denying his motion to extend discovery, (2) quashing his notice to attend hearing for the AGO declarants, (3) concluding the AGO's response to the PRA request was timely, and (4) concluding the AGO's search was adequate.

I. PREHEARING RULINGS

We first address Soule's arguments that the superior court abused its discretion in its prehearing rulings that denied his request to extend discovery and quashed his notice to attend hearing.

We review a superior court's discovery and prehearing orders for PRA proceedings for an abuse of discretion. *Gronquist v. Dep't of Corr.*, 32 Wn. App. 2d 617, 643, 557 P.3d 706 (2024),

*review denied*, ___P.3d ___ (2025); *see Green v. Pierce County*, 197 Wn.2d 841, 858, 487 P.3d 499 (2021) (applying an abuse of discretion standard to review superior court's denial of a motion to compel discovery in PRA proceeding). It is an abuse of discretion for the superior court to make a decision that is manifestly unreasonable or based on untenable grounds. *Gronquist*, 32 Wn. App.2d at 643. " 'A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard . . . .' " *Horvath v. DBIA Servs.*, 31 Wn. App. 2d 549, 563, 551 P.3d 1053 (2024) (internal quotation marks omitted) (quoting *In re Dependency of Z.A.*, 29 Wn. App. 2d 167, 192, 540 P.3d 173 (2023)).

A. MOTION TO EXTEND DISCOVERY

Soule argues that the superior court erred when it denied his motion to extend discovery. He contends that matters should be decided on their merits, not technicalities, and that the extension should have been granted on the equitable standard of excusable neglect. We disagree that the superior court abused its discretion.

"[T]he civil rules control discovery in a PRA action." *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 716, 261 P.3d 119 (2011). The rules grant the superior court broad discretion to manage the discovery process, set deadlines, and set the scope of discovery through a pretrial scheduling order. CR 26(b); *Nakata v. Blue Bird, Inc.*, 146 Wn. App. 267, 277, 191 P.3d 900 (2008), *review denied*, 165 Wn.2d 1033 (2009).

Soule focuses his argument on an explanation of why his failure to comply with the discovery deadline was excusable. He argues that he did not have time to schedule or conduct the desired depositions within the discovery period (or move to extend discovery prior to the deadline) because his counsel "devoted considerable time early on opposing partial summary judgment on

two of the three requests and appealing that ruling" as well as "unforeseen time restraints of counsel included [a family birth], two significant funerals, summer 4th of July break, a demanding case load, and preparations to list a long-term primary residence for sale." Appellant's Opening Br. at 36.

Soule rejects the superior court's reasoning that "the time constraints should have been better planned out so that an extension could have been sought prior to the cutoff" because "unforeseen events may [not] be planned." Appellant Soule's Opening Br. at 37. Soule also rejects the superior court's reasoning that the AGO would be prejudiced by an extension because "[t]he only risk would be exposing the self-serving and deceptive character of [the AGO's] offered declarant testimonies."[4] Appellant's Opening Br. at 38. Finally, Soule contends that the superior court entered no findings to justify its refusal to grant a brief extension of time.

We are unpersuaded by Soule's arguments. Whether or not the superior court entered findings, the record shows the superior court gave multiple reasons supporting its decision. And it is clear from the record that the superior court acknowledged and was sympathetic to Soule's attorney's "personal and work demands." VRP (Oct. 27, 2023) at 21.

---

[4] In his reply brief, Soule complains that the superior court also wrongfully suggested that discovery was less critical because a requestor should " 'have sufficient grounds when they file the case that they can make an argument.' " Reply Br. at 13 (quoting VRP (Oct, 27, 2023) at 22). Soule says this statement "is a blatant violation of the applicable discovery rules, CR 26, and [PRA] case authority." Reply Br. at 13. Notwithstanding that this particular argument was made the first time in a reply brief, Soule pulls this singular quotation out of the full context of the superior court's explanation and exaggerates its significance. It appears that the superior court was merely recognizing that the AGO, not Soule, had the burden of proof and that requesters likely have at least some idea of their argument prior to filing a PRA case. We do not view this isolated statement as an indication that the superior court was rejecting the fundamental principle that parties are entitled to discovery in civil cases.

16

The superior court appears to have largely relied on Soule's failure to request an extension before the discovery period ended (and utter failure to conduct any timely discovery at all). In addition, the superior court noted that Soule's motion for extension made "no mention of what specific issues need to be explored on discovery" or explain why this "after-the-fact evidence" was critical to his case. VRP (Oct. 27, 2023) at 21. The superior court also appears to have considered how the AGO would be prejudiced because it had already conducted its own investigation, prepared its declarations, and filed its opening brief.

The question of whether to grant Soule's motion to extend discovery was within the superior court's considerable discretion. While Soule's reasons for his failure to comply with the discovery schedule may have successfully persuaded other superior courts to extend discovery, the decision here was "within the range of acceptable choices." *See Horvath*, 31 Wn. App. 2d. at 572. Thus, from our review of the record and the superior court's explanation, the superior court did not abuse its discretion when it denied Soule's motion to extend discovery.

B. NOTICE TO ATTEND

Soule next argues that the superior court erred by quashing his notice to attend hearing for the AGO declarants that he filed under CR 43(f).[5] We disagree.

The process for resolving PRA disputes is meant to be "expeditious" so that members of the public can quickly learn if they are entitled to access the records they seek. *See Kilduff v. San Juan County*, 194 Wn.2d 859, 871, 453 P.3d 719 (2019). We give superior courts deference to make management decisions to avoid encumbering PRA proceedings with unnecessary and costly

---

[5] Under CR 43(f), a party may compel the adverse party or its managing agents to testify based on a notice to attend in lieu of a subpoena.

procedural barriers. *See O'Neill v. City of Shoreline*, 170 Wn.2d 138, 153, 240 P.3d (2010). Similarly, Thurston County local rules also require PRA proceedings to follow an "expedited scheduling procedure." TCLCR 3; *see also* TCLCR 16.

With this public policy in favor of expeditiousness in mind, the PRA allows for claims to be decided "solely on affidavits." RCW 42.56.550(3); *see O'Neill*, 170 Wn.2d at 153 (" 'To speed up the court process, a public records case may be decided merely on the motion of a requestor and solely on affidavits.' " (internal quotation marks omitted) (quoting former WAC 44-14-18004(1) (2006)). This policy also benefits the public by avoiding unnecessary costs for PRA cases. When discussing the process of deciding PRA cases by affidavits, our Supreme Court has suggested that appellate courts should avoid " 'interfer[ing] with trial courts' litigation management decisions' " so as to avoid making public disclosure act cases " 'so expensive that citizens could not use the act for its intended purpose.' " *O'Neill*, 170 Wn.2d at 153 (quoting *Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d 788, 801, 791 P.2d 526 (1990). Accordingly, courts have repeatedly chosen to resolve PRA cases without live witnesses, basing their decision purely on affidavits or declarations. *See e.g. id.*; *Amren v. City of Kalama*, 131 Wn.2d 25, 929 P.2d 389 (1997); *Brouillet*, 114 Wn.2d at 793; *Forbes v. City of Gold Bar*, 171 Wn. App. 857, 864-65, 288 P.3d 384 (2012), *review denied*, 177 Wn.2d 1002 (2013).

Although Soule acknowledges that the superior court is permitted to resolve PRA claims based on declarations alone, he contends that he "was not given the time he needed to take depositions to obtain paper testimony, impeachment or otherwise." Appellant's Opening Br. at 40. Because of this, he argues, the only way for him to challenge the AGO's "misleading," and "self-serving" declarations was to compel the AGO witnesses to testify during the merits hearing

and to cross-examine them. Appellant's Opening Br. at 40-41. He argues it was an abuse of discretion for the superior court to quash his notice to attend.

Soule also argues that "[t]rial courts and agencies should not be permitted under the PRA to uniformly set merits hearings with the presumption of no live testimony." Appellant's Opening Br. at 43. According to Soule, PRA hearings by default should include live testimony from witnesses, and "a hearing 'solely on affidavits' " is merely the exception. Reply Br. at 21 (quoting RCW 42.56.550). Soule contends that TCLCR 3 characterizes the final hearing as a "trial" and nothing in the superior court's PRA scheduling order overtly limits the hearing to declarations. 1 VRP (Nov. 17, 2023) at 8. Accordingly, the superior court was required to explicitly notify the parties that it planned to decide the case based on affidavits and not live testimony.

Soule's position that PRA hearings should be "by default" conducted with live testimony fails to recognize the connection between the policies of the PRA and holding hearings on affidavits or declarations. By deciding Soule's claim on declarations, the superior court followed common procedure for resolving PRA disputes expeditiously and inexpensively. *See e.g. O'Neill*, 179 Wn.2d at 153; *Forbes*, 171 Wn. App. at 867. In the face of these policy preferences, Soule provides no relevant basis to suggest that the superior court should have presumed, without more initially from Soule, that the case should have been decided based on live testimony or that it had to notify parties that it made "the requisite discretionary choice to hear the case solely on affidavits." Reply Br. at 22. Indeed, the opposite is true, the superior court was entitled to assume the parties would have overtly raised the issue of live testimony, either at the scheduling conference or soon thereafter, if there was a request to depart from the common method of resolution—

especially given that the merits hearing had long been scheduled for a single day, starting at 1:30 p.m.

Under these circumstances, if Soule had wanted to present live witnesses, he should have raised the issue well before he did. Part of the superior court's reasoning in quashing the notice to attend appeared to be that Soule had some level of responsibility to overtly advocate for his desired process. While it is true that the superior court's scheduling order did not specifically say that Soule's PRA hearing would be based solely on declarations, Soule surely understood that the hearing was scheduled for 1 day, starting in the afternoon, yet Soule said nothing. He was also aware that the scheduling order omitted any witness disclosure deadlines, unlike a regular civil case scheduling order, yet Soule said nothing. On these facts, the superior court's expectation that Soule had an obligation to raise the issue of live testimony well prior to his notice to attend for the AGO witnesses was reasonable.

Based on the superior court's reasoning and the fact that its decisions were consistent with the procedures prescribed in the PRA (and the policies behind those procedures of expeditiousness), we conclude that the superior court did not abuse its discretion.[6]

---

[6] Soule also generally argues that the superior court's decisions are violations of his procedural and substantive due process rights, but he provides no separate analysis for either procedural due process or substantive due process. As for procedural due process, we are unpersuaded, based on the record, that the superior court failed to follow all required procedures under the PRA. RCW 42.56.550; *see also O'Neill*, 170 Wn.2d at 153. And without any authority from Soule supporting his contention that his substantive due process rights were violated, we reject his argument. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

III. THE AGO'S COMPLIANCE WITH THE PRA

Beyond Soule's challenge to the superior court's prehearing rulings, Soule also argues that the superior court erred in dismissing his underlying case. He makes two arguments. First, Soule contends the AGO violated the PRA by failing to provide a prompt response. Second, he contends that the AGO's search was inadequate. We disagree with both arguments.

Challenges to agency actions for violations of the PRA are reviewed de novo. *Neigh. All.*, 172 Wn.2d at 715. It is the agency's burden to show that it complied with the PRA. *Id.* at 720-21; *Cantu v. Yakima Sch. Dist. No. 7*, 23 Wn. App. 2d 57, 79, 514 P.3d 661 (2022). To satisfy its burden, an agency must show that they promptly and adequately identified and disclosed any requested records, absent a specific exception that is enumerated in the statute. *Neigh. All.*, 172 Wn.2d at 715; RCW 42.56.070(1), .080(2), .520.

A. PROMPTNESS OF THE AGO'S SEARCH

Whether an agency has violated the PRA by failing to provide a "prompt" response to a request is a fact-specific inquiry. *Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 653, 334 P.3d 94 (2014), *review denied*, 182 Wn.2d 1011 (2015). Even though the PRA requires an agency to respond to a request within five business days, it allows agencies to take a longer time in order "to clarify the intent of the request, to locate and assemble the information requested, to notify third persons or agencies affected by the request, or to determine whether any of the information requested is exempt and that a denial should be made as to all or part of the request." RCW 42.56.520. An agency may also disclose the relevant records to the requestor "on a partial or installment basis as [the] records that are part of a larger set of requested records are assembled or made ready for inspection or disclosure." RCW 42.56.080(2).

Soule argues that by taking over two years from his initial request to the final closure of the request, the AGO violated the PRA. Pointing to *O'Dea v. City of Tacoma*,[7] where we held that an agency's 10-month delay in responding to a PRA request was unreasonable, Soule complains that, here, "[t]he [AGO] took more than double that time." Appellant's Opening Br. at 26. He further contends that none of the circumstances listed in RCW 42.56.520 that permit an agency to take longer than five days to respond to a PRA request apply. According to Soule, the agency's delay in getting him records was not due to a need to clarify the intent of his request, a need to locate or assemble the records, a need to notify third parties affected by the request, or a need to determine whether the requested records were exempt from the PRA. Instead, Soule claims the AGO "deliberately chose to limit the volume of each installment [of records] rather than simply turn it all over at once." Appellant's Opening Br. at 27.

To the extent that Soule is suggesting that the AGO had no excuse for not completing his request in five days, the suggestion is unrealistic. As the AGO's declarations explain, the AGO dedicated time to help Soule narrow his search and advised him that using terms that were too broad would make fulfilling his request take longer. These declarations clearly support the need for additional time to "locate and assemble the information requested" and to "determine whether any of the information requested is exempt" as expressly permitted by RCW 42.56.520(2).

In fact, the sheer volume of responsive documents also belies Soule's position. Even though Soule's request was narrowed through discussions with AGO employee Young, Soule's

---

[7] 19 Wn. App. 67, 493 P.3d 1245 (2021).

request produced over 30,000 pages of records that were provided to him in 17 installments.[8]  As documented in the AGO declarations, compiling these records for production required the AGO to give notice to the Consumer Protection Division and review and redact personal and financial information that is exempt from disclosure under the PRA.[9]    *see* RCW 42.56.520(2); RCW 42.56.270.

As for Soule's complaint that the records should have been turned over "all at once," he offers no explanation how this type of production was possible (unless no records were produced until the very end of the process).  Indeed, production by installments is expressly permitted by the PRA.  RCW 42.56.080(2).

Although the length of time the entire process took may have appeared long, in our review of the record, all of the AGO's actions that contributed to this duration were consistent with what the PRA allows.  Nothing in the record supports Soule's contention that the AGO's delay in

---

[8] These 30,000 plus pages did not include any performance evaluations.  While Young searched for personnel records responsive to Soule's request, they were determined to be exempt from disclosure under RCW 42.56.230 and *Dawson v. Daly*, 120 Wn.2d 782, 845 P.2d 995 (1993).  CP at 366, 369.

[9] It appears that some of the requested information may have implicated protections under federal privacy laws, which apply to the PRA.  *See Ameriquest Mortg. Co. v. Off. of the Att'y. Gen.,* 170 Wn.2d 418, 431, 441, 241 P.3d 1245 (2010).  These laws restrict an agency's ability to disclose " '[p]ersonally identifiable financial information,' " which includes names, addresses, phone numbers, " '[i]nformation a consumer provides to you on an application to obtain a loan,' " or " '[a]ny information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [the financial institution's consumer].' " *See id.* (quoting 16. C.F.R. § 313.3(o)(1), (2)(i)) (some alterations in original).  "Any information meeting the definition of 'personally identifiable financial information' is nonpublic personal information that may not be disclosed, regardless of whether the information appears in loan files, e-mails, or the AGO's internal work product." *Id.* at 441.

producing his records was somehow deliberate or purposeful. Thus, his argument that the AGO violated the PRA by failing to promptly respond to his request fails.

### B. ADEQUACY OF THE AGO'S SEARCH

Finally, in a related argument, Soule contends that the superior court erred in concluding that the AGO conducted an adequate search. Soule contends the AGO's search actually resulted in "meaningless installments" that were unresponsive to his request. Appellant's Opening Br. at 2. We disagree.

When responding to a request, agencies must perform an adequate search for responsive records—an inadequate search is considered a violation of the PRA. *Neigh. All.*, 172 Wn.2d at 721. While an agency must show that its search was adequate, "[t]he PRA does not require agencies to create or produce records that do not exist." *O'Dea v. City of Tacoma*, 19 Wn. App. 2d 67, 79, 493 P.3d 1245 (2021). "The adequacy of a search is judged by a standard of reasonableness, that is, the search must be reasonably calculated to uncover all relevant documents." *Neigh. All.*, 172 Wn.2d at 720. Whether or not the agency actually found responsive records is irrelevant so long as its search was reasonable based on the circumstances. *Cantu*, 23 Wn. App. 2d at 84 ("A search may be adequate and still fail to identify responsive records.").

For a search to be reasonable, an agency is only required to search places where it is reasonably likely for responsive records to be found. *Neighb. All.*, 172 Wn.2d at 720. The search does not have to be perfect, it just cannot be "unnecessarily narrower" than the request. *Cantu*, 23 Wn. App. 2d at 85. For example, depending on the nature of a particular request, it may be insufficient for an agency to only search for hardcopy records; they may reasonably need to search additional databases, communications, and e-mails. *Id.* at 85-86. We also measure reasonableness

by looking at the search as a whole, "not on whether the requester can think of alternative search terms that may produce more records." *Id.* at 85.

As discussed above, a claim alleging a PRA violation can be resolved based on declarations alone. RCW 42.56.550. An agency may rely on declarations made in good faith that include the type of the search performed, identify the search terms used, and "establish that all places likely to contain responsive materials were searched." *Neigh. All.*, 172 Wn.2d at 721. Agency declarations will be presumed to be made in good faith. *Forbes*, 171 Wn. App. at 867. A requester's "[p]urely speculative claims about the existence and discoverability of other documents will not overcome an agency affidavit." *Id.*

Soule argues that the AGO's search here was inadequate because it did not search appropriate locations or databases for the records or use reasonable search methods or search terms. According to Soule, when searching for communications, the agency should have searched using "technologies actually utilized by the individuals known to be communicating" and not used a remote search engine or only searched the Office 365 database. Appellant's Opening Br. at 31. Further, according to Soule, the AGO should have searched for all communications, not just e-mails. Soule also challenges the AGO's search terms, asserting that the AGO should have used additional key words that included abbreviations "known by the A[GO] to be used when communicating," like "AOD" and "NMS." Appellant's Opening Br. at 31.

Much of Soule's arguments are rooted in his suspicions that the AGO's declarations are "deceptive" and "self-serving." Appellant's Opening Br. at 18. For example, Soule casts doubt that merely searching Outlook 365 for e-mails was effective because if Deputy Chief Information Officer Singleton was subject to cross-examination, he "likely would have revealed that terminated

or retired users e-mail was not migrated" when the AGO switched its databases in 2019. Appellant's Opening Br. at 17. Soule also appears to express skepticism that Consumer Protection Division employee Teng was the only one to have responsive records and whether Teng ever actually produced the records that she found.

We do not find any support in the record for Soule's allegations. Despite Soule's speculations about the credibility of the AGO's declarations, we presume agency declarations to be made in good faith. *See Forbes*, 171 Wn. App. at 867. With this presumption, the declarations describe an adequate search that meets the demands of the PRA.

While the AGO did not use the specific search terms that Soule argues they should have used, a search is not unreasonable just because an agency did not "think of alternative search terms that may produce more records." *See Cantu*, 23 Wn. App. 2d at 85. The declarations of Young, Teng, Ashley, and Gutzmer show that AGO employees used search terms broad enough to potentially include all the individuals named by Soule as they related to the Wells Fargo negotiations and settlements. And e-mails that were archived and had been migrated from the AGO's old e-mail database were included in the search. Any e-mail that contained the relevant search terms "in the body of the email, subject line, to and from and cc/bcc, threads within the email, and attachments" would come up. CP at 366.

The AGO employees also went beyond searching for e-mails; they searched the AGO's physical files, electronic files complaint database, and "anywhere [they] thought records would still be in existence." CP at 260. They searched the litigation files for "Wells Fargo Assurance of Discontinuance" and "Wells Fargo National Mortgage" and did searches of the databases as a whole in case relevant documents would come up from other places. CP at 259. When searching

26

the complaint database, they used the 13 categories of complaints that Soule had provided in his request. In both of these physical and electronic locations, they specifically searched for "a particular communication between AAG Dave Huey and Wells Fargo that Soule believed existed." CP at 260. Further, each complaint "contain[ed] many communications between and among members of the AGO and Wells Fargo." CP at 366.

On this record, the AGO's search was reasonably calculated to uncover all relevant documents that were still available. *See Neigh. All.*, 172 Wn.2d at 720. In fact, even though many documents may have been destroyed prior to Soule's request as a result of the AGO's retention policy, over 30,000 records were still produced. Just because Soule speculates that the AGO could have done more, it does not follow that the AGO's search was inadequate. *See Cantu*, 23 Wn. App. 2d at 85 (concluding a search does not have to be perfect). Therefore, AGO met its burden to prove that it complied with the PRA.

IV. COSTS AND ATTORNEY FEES

Soule requests attorney fees and costs for the superior court action and on appeal. RAP 18.1 allows a party to recover attorney fees or expenses so long as "applicable law grants to a party [that] right." And the PRA allows a requestor who prevails against an agency to recover costs and attorney fees. RCW 42.56.550. Because Soule did not prevail below and does not prevail here, we deny his request for costs and attorney fees.

CONCLUSION

We affirm the superior court.

No. 59172-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

LEE, J.